## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO: 3:16cr222(JBA) |
| v. | : | HONORABLE JANET B. ARTERTON |
| ALIYAH THERESA JULIATE DAVIS, a/k/a THERESA SUTHERLAND | : : | May 4, 2017 |

### MEMORANDUM IN AID OF SENTENCING

The following discussion of points and authorities is submitted on behalf of Aliyah Theresa Juliate Davis a/k/a Theresa Sutherland, to aid this court in fashioning a sentence that is "sufficient but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, provide just punishment and afford adequate deterrence, satisfy the need for the sentence to avoid unwarranted disparities and to provide restitution under 18 U.S.C. § 3553 (a).

The defendant acknowledges the seriousness of this offense since it was committed to avoid the start of service of a sentence imposed for a previous offense of aggravated identity theft. The defendant asks the court to look at the reasons for her actions and to take her childhood and the diminished capacity it generated as described by James Pier, Ph.D., in his comprehensive report into consideration in imposing a sentence.

That mental state, combined with the manner in which the original sentence of fifty-one (51) months blindsided the defendant profoundly affected the ultimate result.

The defendant respectfully asks the court to consider imposing the mandatory two-year sentence concurrently with the original sentence and increase her overall sentence by an amount within the advisory guideline range on the underlying offenses of 12-to-18 months.

Such a sentence would be a profound sentence for this defendant given her mental state and the effect it would have on her family.

1

### *History Of Both Cases*

On August 5, 2013, the defendant was arrested by federal authorities and charged, along with two co-defendants in criminal number 3:13cr140(AVC) with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 and aggravated identity theft in violation of 18 U.S.C. § 1028 A(a)(1).  She pleaded guilty before Judge Covello on November 19, 2013, and sentencing was scheduled for December 17, 2014.

The parties in their plea agreement agreed the advisory guideline range on the wire fraud count was 27-to-33 months, followed by a mandatory 24-months consecutive sentence on the 1028 A count.  Despite the inevitability of a sentence of incarceration, the defendant appeared for her sentence hopeful she would get a sentence of home confinement or, if incarceration occurred, she would serve it at Danbury (not knowing it was then not taking women inmates).

These expectations, although impossible, were not unreasonable for Ms. Davis since her attorney in his sentencing memo asked the court to sentence her to "zero jail time on count seven and the mandatory minimum of two (2) years on count eight but specifically requests that the two-year confinement period be served as home detention or home confinement."

When Judge Covello sentenced her to fifty-one (51) months and recommended it be served at Danbury FCI, the defendant went into "survival mode".  The reality of the situation overwhelmed her when a marshal told her Danbury was not taking women and, when, she was given a short time to turn herself in for service of her sentence.

It was shortly thereafter that the defendant committed the offenses which place her before this court.

The defendant pleaded guilty in this case on December 12, 2016 and has been incarcerated since September 17, 2016. Her conduct in this case has been set forth in detail in the PSR which the defendant acknowledges is accurate.

When the undersigned first met the defendant, it was apparent that she was profoundly depressed, extremely tearful and talking about ending her life. She expressed that her family might not survive without her and that what she did was wrong and only made things worse. Her state was such that a psychological expert was requested. Dr. Pier will testify at trial concerning the defendant's diminished capacity and its effect on these offenses.

## *Sentencing Analysis*
## *Nature And CircumstancesOof The Offense Per § 3553 (a)(1)*

The defendant acknowledges that the offense conduct, as set forth in Ms. Nagy's thorough PSR does a very complete job of detailing the offenses in this case.

The defendant apologizes for her activity and realizes it was an affront to the integrity of the judicial system. The defendant did not intend it as such since she was overwhelmed by her situation but does wish to apologize to the court.

## *History And Characteristics Of The Defendant Per § 3553 (a)(2)*

The defendant's history and characteristics are set forth in detail in the PSR but also analyzed in detail in Dr. Pier's report.

The defendant was abandoned by her parents and by age thirteen (13) was caring for siblings and by age fifteen (15) was emancipated, a mother and was involved in a violent domestic relationship.

To her credit, she became a hard-working, successful woman but was haunted by the "parentification" described in the report of her present and past mental state.

Aliyah needs counseling and substance abuse treatment. Dr. Pier predicts treatment will successfully address the negative vestiges of her early life.

Dr. Pier will testify at the defendant's sentencing and answer any questions the court might have regarding his diagnosis and its effect on the defendant. He will also testify regarding Aliyah's chance for rehabilitation and for shedding the negative remains of her youth.

### *The Kind Of Sentences Available Per § 3553 (a)(3)*

The statutory provisions are that on: Count I, the maximum term of imprisonment is twenty (20) years; Count II, is ten (10) years; Count III, is five (5) years; and Count IV, is two (2) years imprisonment, consecutive to any other term of imprisonment imposed.

The Guideline provisions call for 12-to-18 months on the underlying offenses and 24 months consecutive and mandatory on the aggravated identity theft count for a guideline range of 36-to-42 months.

A variance is requested below the total advisory range based on the defendant's documented diminished capacity.

### *The Guideline Analysis Per § 3553 (a)(4)*

The PSR expressed an advisory guideline range of 36-to-42 months. The parties' plea agreement gives them the right to argue for a variance or departure from the guideline range.

The defendant asks this court to impose the twenty-four-month mandatory portion of this sentence concurrently with Judge Covello's sentence previously imposed, fifty-one-month sentence. The 12-to-18-month advisory portion could be added to that sentence so that the effective total sentence would be 63-to-69 months for both cases.

The undersigned respectfully requests such a sentence because of the defendant's diminished capacity which is explored in depth by Dr. Pier.

Even though this court may vary from the advisory guidelines by considering diminished capacity as a § 3553 (a) factor, so too, do the guidelines recognize such a variance (downward departure).

U.S.S.G. § 5K2.13, in a policy statement states:

A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

In addition, the Second Circuit in 1992 in the case of <u>United States v. Johnson</u>, 964 F.2d 124 (2d Cir. 1992) found extraordinary family circumstances as grounds for a downward departure. This case was ground breaking since most courts would not consider a departure at that time for family responsibilities of any kind.

The guidelines themselves still do not provide for such a family responsibility departure. See U.S.S.G. § 5HL6.

Fortunately, post <u>Booker</u>, courts do not need a guideline blessing but can include family circumstances as a variance ground. This is especially true, whereas here, neuroscience has examined and concluded that they were of such importance here that they precipitated a diminished capacity that contributed to the commission of the offenses (parentification).

Two helpful cases which discuss diminished capacity post <u>Booker</u> are <u>United States v. Portman</u>, 599 F3d 633, 638 (7th Cir. 2010) and <u>United States v. Patzer</u>, 548F. Supp. 2d 612, 169 (N.D. 111. 2008). Both contain a thoughtful analysis of the effect of diminished capacity.

<u>Portman</u> indicates a person suffering from a diminished capacity is less culpable and thus a reduced sentence is reasonable and <u>Patzer</u> approves of a substantial downward variance because of mental health problems, and the defendant's education and support from family and friends.

5

This court can be assured based on Dr. Pier's assessment that the defendant can be treated and returned to a healthy mental state.

### *Pertinent Policy Statements Per § 3553 (a)(5)*

There are no significant pertinent policy statements, except for the previously mentioned one regarding diminished capacity which the defendant wishes to point out to this court.

### *The Need To Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty Of Similar Conduct Per § 3553 (a)(6)*

This factor would seem difficult to apply in the abstract and separate from the other factors. If this court faithfully applies the § 3553 (a) factors then, by definition sentence disparity has been reduced.

### *Restitution Per § 3553 (a)(7)*

The defendant expects a restitution order will be entered by the court.

### *Satisfaction Of The Needs Of Sentencing*

The following analysis is made with the *parsimony clause* in mind. The defendant contends such an analysis leads to the conclusion that a reasonable further sentence of incarceration will satisfy the purposes of sentencing and the mandate of *parsimony.*

### *To Reflect The Seriousness Of The Offense, Promote Respect For The Law, Provide Just Punishment Under § 3553 (a)(2)(A)*

The defendant contends that a moderately increased sentence would certainly reflect the seriousness of the offense considering the fact that the defendant has diminished capacity and will spend a substantial period in prison away from her family. This will be hard time.

The defendant has exhibited that she is ready to turn her life around and has taken some steps in that direction to show the court that she will be a productive member of society in the

future.[1]

### *To Afford Adequate Deterrence To Criminal Conduct Under § 3553 (a)(2)(B)*

Consideration of general deterrence, required under this section, mandates that the court consider the extent to which similarly situated potential offenders will be deterred from committing similar crimes by whatever sentence the court imposes in this particular case.  This is, however, a highly unpredictable exercise.  It assumes that a person in the defendant's position considering whether to commit a crime weighs the consequences of getting caught and further weighs the benefits against the incremental risks of prison sentences of particular terms.  However, most persons would not commit the crime at all if they thought they would be caught, regardless of the punishment.

Further, it is impossible to conclude that somewhere along the range of "just" punishment there is a tipping point, a point beyond which a rational potential offender will conclude not to become involved in <u>that</u> offense due to the sentence for <u>this</u> offense.  In any event, the Court can readily conclude that any reasonable sentence imposed will not serve materially different purposes as it relates to general deterrence.  It is therefore, without question, that the punishment of this defendant by a reasonable sentence with a long period of supervised release with conditions of mental and substance counseling would be a severe sentence.

---

[1] The PSR mentions that while the defendant was postponing her sentence, records show she went on two cruises. While that is true, it requires explanation. The defendant was not frolicking while the court thought she was in failing health.
The first cruise was paid for by Renee Middleton, originally for her husband who could not attend. She asked Aliyah to take her husband's place because she was so stressed. The cruise was a wedding cruise for Tamara Dismick, a fellow church parishioner of the defendant.
The second cruise was a cruise for Latacha Sutherland since she was aged and sick. Latacha was the defendant's mother-in-law and all cruise-goers were paid for by Symerris Kahn, a New York relative. Latacha died on April 17, 2016.

### *To Protect The Public From Further Crimes Of The Defendant Under § 3553(a)(2)(C)*

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of the greatest practical concerns, and the most capable of being measured. Dr. Pier feels that with proper treatment, the defendant is unlikely to offend again.

### *To Provide The Defendant With Needed Education And Vocational Training, Medical Care, And Other Correctional Treatment In The Most Effective Manner Under § 3553 (a)(2)(D)*

The defendant is in need of psychotherapy and substance abuse counseling and can get that through psychiatric counseling while in the prison system and while on supervised release. The defendant is agreeable to whatever conditions the court imposes regarding her mental health and substance issues and is anxious to rid herself of these last vestiges of her troubles as a teenager.

### *Conclusion*

The court has a copy of Dr. Pier's excellent and thorough report. He will also testify and answer whatever questions the court, counsel or probation asks.

In the PSR, Ms. Nagy comments in Paragraph 139:

It remains confounding to attempt to understand why someone with such academic qualifications, with a history of consistent employment, often holding several jobs at once, would choose to engage in such criminal conduct.

Dr. Pier noticed that observation in his review of the PSR and responded:

Ms. Meghan Nagy has astutely noted in her presentence report that is was difficult to understand why someone with Ms. Sutherland's academic qualifications of consistent employment would choose to engage in such criminal conduct. It is important to recognize that impressive academic and occupational achievements are not mutually exclusive of the psychological pathology and dynamic discussed above. The answer to the critically important question raised by Ms. Nagy is found in the psychological analysis and dynamics described above.

Dr. Pier concludes that:

Ms. Sutherland survived severe and chronic stress, neglect and abuse. She was parentified early and, at a tender age, assumed the mantle of responsibility for

8

herself and many others who relied upon her for their well-being. She developed a personality structure centered around conscientiousness and her identity as a provider. Supporting and providing for her family has been the central focus of her entire life. The notion of losing that role, and the potential for harm to befall her family as a result of this, was overwhelming to her and precipitated a psychological crisis, which exacerbated of her long-standing depression, anxiety and trauma related disorder, as well as contributing to her abuse of substances. She has struggled with unrecognized depression and anxiety and never developed effective psychological coping resources for a healthy balance in her life. These critically important factors were never recognized, diagnosed or treated for most of her life, other than a single trial of psychotropic medication. Finally beginning psychotherapy in 2016, Ms. Sutherland realized that she had been in dire need of treatment her entire life. Sadly, an understanding of these issues, which is still emerging for the subject, and appropriate treatment, came too late. The history and dynamics, psychological factors, and diagnoses described above, diminished Ms. Sutherland's capacity to think, reason and make decisions rationally and effectively and played a substantial and significant role in her maladaptive behavior and criminal activity.

The prognosis for Ms. Sutherland to benefit from appropriate, comprehensive and sustained mental health treatment is excellent. She requires psychotherapy and psychopharmacological management to address her ongoing and long-standing mental health needs. As long as the appropriate treatment is provided, there is every reason to expect that Ms. Sutherland would respond positively to treatment and that she would be able to resume employment and her role as supporter and provider for her family when legally permitted to do so. In that clinical scenario, the risk for recidivism is extremely low.

The undersigned visited the defendant's home recently and met with family members. All were tearful and missed Aliyah. Her daughter Dajah gave the undersigned the attached college essay. In light of Dr. Pier's report on the effects of the childhood burdens on the defendant, frankly it both warmed my heart and alarmed me.

THE DEFENDANT,


By:_____/s/_____
Robert C. Mirto, Esq., Juris #: ct00188
The Law Offices of Mirto & Rasile, LLC
44 Church Street, PO Box 462
West Haven, CT 06516
Ph: (203) 934-7050
Fx: (203) 934-7053
bob@mirtorasile.com

## **CERTIFICATION**

Pursuant to the Court's designation of this matter as an electronically filed case, and in accordance with the requirements for certification of service in such cases, the undersigned certifies that the foregoing document was filed electronically on the 4th day of May 2017. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.


By:_____/s/_____
Robert C. Mirto, Esq., ct00188